UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANASTACIO SALVADOR RODRIGUEZ, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ADAMS RESTAURANT GROUP, INC. D/B/A ) <br> CLAUDIA'S STEAKHOUSE, ET AL. ) <br> ) <br> Defendants. ) <br> ) | Civil Action No. 1:16-CV-00977-EGS <br> Hon. Emmet G. Sullivan |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
RENEWED MOTION FOR SUMMARY JUDGMENT**

Defendants Adams Restaurant Group, Inc. d/b/a Claudia's Steakhouse ("ARG" or "Claudia's Steakhouse") and Claudia Rivas (collectively, "Defendants"), by counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure, submit this Memorandum of Law in Support of their Renewed Motion for Summary Judgment ("Motion"), and hereby state as follows:

**I.  INTRODUCTION.**

This case is based solely upon Plaintiff's uncorroborated, self-serving assertions regarding his job duties as Sous Chef for Claudia's Steakhouse and the hours he worked, which are not supported by any credible evidence in the record. Plaintiff's assertions of fact are insufficient for his claims to survive beyond the summary judgment stage.

Plaintiff alleges that Defendants improperly classified him as an exempt employee and failed to pay him overtime wages in violation of the Fair Labor Standards Act ("FLSA") (Count I), the District of Columbia Minimum Wage Act ("DCMWA") (Count II), and the District of Columbia Wage Payment and Wage Collection Law ("DCWPCL") (Count III). However, Defendants are entitled to summary judgment as a matter of law as to all Counts because there is no corroborating evidence of Plaintiff's assertion that he should have been classified as a non-

exempt employee and paid overtime for all hours worked in excess of 40 per week. Because all three claims rely on a determination that Plaintiff was misclassified, the Complaint should be dismissed in its entirety, with prejudice. Alternatively, Plaintiff's assertion of willfulness must fail because there is no evidence of any such conduct.

## II. STATEMENT OF UNDISPUTED FACTS.

1. Plaintiff was hired by ARG as a part-time Line Cook on or about June 22, 2015. As a Line Cook, Plaintiff was a non-exempt employee compensated at an hourly rate of $14. In this position, Plaintiff prepared ingredients and cooked food. *See* **Exhibit A**, relevant excerpts of Deposition of Claudia Rivas, Jan. 31, 2017 ("Rivas Depo., Vol. I"), at 72:12-15.

2. On or about September 21, 2015, Plaintiff was promoted to the position of Sous Chef at an annualized salary of $55,000. *See* **Exhibit B**, ARG's Answers to Pl.'s First Set of Interrogs., Answer to Interrog. No. 9, at pp. 10-11. Plaintiff was classified as an exempt employee and therefore was not eligible for overtime, and did not clock in and out or otherwise record his hours. *See id.* at Answer to Interrog. No. 11, at p. 11. He was paid the same salary regardless of the number of hours he worked per week. *See* Ex. A, Rivas Depo., Vol. I, 81:14-21.

3. For approximately the first month of his employment as Sous Chef, there was one other Sous Chef, Louis Benitez, employed at the restaurant. Thereafter, Plaintiff was the only Sous Chef employed by ARG. *See* **Exhibit C**, relevant excerpts of Deposition of Anastacio Salvador Rodriguez, Feb. 1, 2017 ("Rodriguez Depo., Vol. I"), at 63:12-20. While Plaintiff and Mr. Benitez were employed as Sous Chefs at the same time, one was responsible for the day shift and one was responsible for the night shift. *See* **Exhibit D**, relevant excerpts of Deposition of Charles Adams, Feb. 17, 2017 ("Adams Depo."), at 160:18-161:7.

4. During Plaintiff's tenure as Sous Chef, there was no Head Chef at the restaurant. *See* **Exhibit E**, relevant excerpts of Deposition of Anastacio Salvador Rodriguez, Feb. 16, 2017 ("Rodriguez Depo., Vol. II"), at 121:20-122:2. Although Ms. Rivas' title was Executive Chef, her primary residence is in Florida and she was only present at the restaurant 2-5 days per month. *See* Ex. A, Rivas Depo., Vol. I, 31:2-3; *see also* **Exhibit F**, relevant excerpts of Deposition of Claudia Rivas, Feb. 1, 2017 ("Rivas Depo., Vol. II"), at 404:3-9. She did not oversee kitchen operations. *See* Ex. A, Rivas Depo., Vol. I, 187:10-11. Although the restaurant had a video camera that covered the kitchen area, its purpose was for security and anti-theft; Ms. Rivas did not monitor the video camera to supervise kitchen operations. *See id.* at 206:7-14; *see also* Ex. F, Rivas Depo., Vol. II, at 404:15-405:2.

5. Under the Sous Chef were all of the kitchen staff, including Line Cooks and Dishwashers. *See* Ex. A, Rivas Depo., Vol. I, 174:14-17.

6. At the time Plaintiff was promoted to Sous Chef, he had over 19 years of experience in the culinary industry. *See* Ex. A, Rivas Depo., Vol. I, 212:4-13; 228:18-229:15.

7. The restaurant served lunch and dinner on weekdays (Monday through Friday) and dinner on weekend nights (Saturday and Sunday). *See* **Exhibit G**, Declaration of Marlon Alfaro ("Alfaro Decl.") at ¶ 6; *see also* Ex. A, Rivas Depo., Vol. I, 58:14-19.

8. Sous Chefs, including Plaintiff, wore an embroidered jacket that had their name and "Sous Chef" on it. Line cooks did not wear embroidered jackets. *See* Ex. F, Rivas Depo., Vol. II, 402:16-19.

9. Plaintiff was terminated from his employment on March 19, 2016. *See* Ex. B, Answer to Interrog. No. 9, at pp. 10-11.

## III. ARGUMENT.

### A. APPLICABLE LEGAL STANDARD.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (internal quotation marks omitted). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241, 259 U.S. App. D.C. 115 (D.C. Cir. 1987).

To defeat summary judgment, the nonmoving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. Indeed, the nonmovant must provide evidence that would permit a reasonable jury to find in its favor. *See Laningham*, 813 F.2d at 1242. Further, a nonmoving party must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Liberty Lobby, Inc.*, 477 U.S. at 252. "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). Accordingly, the nonmoving party may not rely solely on

allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675, 334 U.S. App. D.C. 92 (D.C. Cir. 1999). For the Court to accept anything less "would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Id.* at 675; *see also Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1141 n.3, 394 U.S. App. D.C. 239 (D.C. Cir. 2011) (noting that at summary judgment stage, plaintiff "can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' . . . which for purposes of the summary judgment motion will be taken to be true'" (quoting *Sierra Club v. EPA*, 292 F.3d 895, 898-99, 352 U.S. App. D.C. 191 (D.C. Cir. 2002) (ellipsis and second alteration in original))); *Deloatch v. Harris Teeter, Inc.*, 797 F. Supp. 2d 48, 56-57 (D.D.C. 2011) (granting summary judgment for employer in FLSA action where employee's "only evidence of uncompensated work [was] his own deposition testimony and his answers to the defendant's interrogatories").

A plaintiff cannot defeat a summary judgment motion on the basis of self-serving testimony alone. *See Arrington v. United States*, 473 F.3d 329, 343, 374 U.S. App. D.C. 189 (D.C. Cir. 2006) (recognizing that "summary judgment 'is *most likely* when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined either by other credible evidence, physical impossibility or other persuasive evidence that the plaintiff has deliberately committed perjury" (quoting *Johnson v. Wash. Metro. Area Transit Auth.*, 883 F.2d 125, 128, 280 U.S. App. D.C. 53 (D.C. Cir. 1989)) (emphasis added)); *Johnson v. D.C.*, 947 F. Supp. 2d 123, 132-33 (D.D.C. 2013) (finding that "self-serving testimony . . . alone is insufficient to survive a motion for summary judgment"); *Booth v. D.C.*, Civil Case No. 04-1909-RJL, 701 F. Supp. 2d 73, 82 (D.D.C. 2010) (granting summary judgment on retaliation claim because "aside from [plaintiff's] own self-serving

affidavit, there [was] simply no evidence on the record to suggest these events even occurred," thus "there is not enough evidence for a jury to conclude . . . that any such action was motivated, even in part, by [plaintiff's] protected activity"); *Holmes-Martin v. Leavitt*, 569 F. Supp. 2d 184, 208 (D.D.C. 2008) (concluding that "summary judgment would normally be appropriate," "[b]ecause the plaintiff offers no corroboration for her affidavit"); *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 90 (D.D.C. 2006) (finding that "self-serving affidavits alone will not protect the non-moving party from summary judgment" (quoting *Carter v. George Wash. Univ.*, 180 F. Supp. 2d 97, 111 (D.D.C. 2001), *aff'd*, 387 F.3d 872, 363 U.S. App. D.C. 287 (D.C. Cir. 2004))).

### B. PLAINTIFF'S OVERTIME CLAIMS FAIL AS A MATTER OF LAW.

Plaintiff contends that the FLSA, DCWPCL and DCMWA[1] entitle him to receive overtime compensation for work performed in excess of 40 hours per week. *See* 29 U.S.C. §

---

[1] Liability under DCWPCL and DCMWA are construed consistently with the FLSA, so Defendants will refer to the FLSA herein. *See Ventura v. Bebo Foods, Inc.*, 738 F. Supp. 2d 1, 5 n.2 (D.D.C. 2010); *Del Villar v. Flynn Architectural Finishes*, 664 F. Supp. 2d 94, 96 (D.D.C. 2009); D.C. Code § 32-1004(a)(1); *Powell v. Am. Red Cross*, 518 F. Supp. 2d 24, 37 (D.D.C. 2007) (granting motion for summary judgment for employer in DCMWA action using FLSA law to determine that plaintiff employee was exempt from the DCMWA overtime requirements); *Jones & Assocs., Inc. v. D.C.*, 642 A.2d 130, 134 (D.C. Cir. 1994)). Furthermore, summary judgment is warranted on Count III of the Complaint under the DCWPCL because this Court has previously found that the DCMWA provides an exclusive remedy when DCWPCL and DCMWA counts are based on the same factual allegations. *See Thompson v. Digicon Corp.*, 107 F. Supp. 3d 49, 50-52 (D.D.C. 2015) (dismissing an employee's DCWPCL claim for unpaid overtime wages when the DCWPCL claim was based on the same facts as the employee's DCMWA count); *Driscoll v. George Wash. Univ.*, 938 F. Supp. 2d 19, 25 (D.D.C. 2013) (dismissing an employee's DCWPCL claim for unpaid overtime wages in action for unpaid overtime wages based on both the DCWPCL and DCMWA "so as to avoid rendering the DCMWA's remedy provisions meaningless"). Moreover, his Court has previously found that an employee may not recover for unpaid wages separately under the FLSA, the DCMWA, and the DCWPCL. *See Perez v. C.R. Calderon Constr., Inc.*, Civil Action No. 12-697-BAH, 2016 U.S. Dist. LEXIS 177234, *57 (D.D.C. Dec. 22, 2016). Further, with respect to liquidated damages, a prevailing employee is only entitled to the highest amount of liquidated damages permitted under the three statutes, rather than separate recovery under each statute. *Id.* Moreover, Plaintiff's request for "quadruple damages" under the DCWPCL (Compl. ¶ 39 ("wherefore" clause)) is not supported by the statute, which only provides for "treble" liquidated damages like the DCMWA.

6

207(a)(1). However, an individual is employed in a "bona fide executive" capacity, and thus, is exempt from the overtime requirements of the FLSA, when: (1) he is compensated on a salary basis at a rate of not less than $455 per week; (2) his primary duty is management of the enterprise or of a customarily recognized department or subdivision thereof; (3) he customarily and regularly directs the work of two or more other employees; and (4) he has the authority to hire or fire other employees or his suggestions and recommendations as to the hiring, firing, advancement, or any other change of status of other employees is given particular weight. 29 C.F.R. § 541.100(a). Where, as here, these requirements are met, the individual falls within the scope of the "executive exemption" and is not entitled to overtime pay. 29 U.S.C. § 213(a)(1). The ultimate decision whether an employee is exempt from the FLSA's provisions regarding overtime compensation is a question of law. *See Robinson-Smith v. Gov't Emps. Ins. Co.*, 590 F.3d 886, 891, 389 U.S. App. D.C. 46 (D.C. Cir. 2010) (citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714, 106 S. Ct. 1527, 89 L. Ed. 2d 739 (1986)).

The Department of Labor "has promulgated detailed regulations outlining the criteria for the application of the FLSA exemptions." *McKinney v. United Stor-All Centers LLC*, 656 F. Supp. 2d 114, 121 (D.D.C. 2009) (citing 29 C.F.R. § 541.100 *et seq.*). These regulations "are entitled to judicial deference and are the primary source of guidance for determining the scope of exemptions to the FLSA." *Id.* (quoting *Clements v. Serco, Inc.*, 530 F.3d 1224, 1227 (10th Cir. 2008)). The DOL regulations define the term "primary duty" as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). The "major emphasis" of the inquiry is "on the character of the employee's job as a whole." *Id*. The regulation lists the following factors as relevant to the "primary duty" analysis:

---

*See* D.C. Code §§ 32-1303(4), 32-1012(b)(1). In any case, a duplicative recovery under more than one statute in this case would be improper.

> . . . the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id*. Although "[t]he amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee," time spent "is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work." *Id*. § 541.700(b).

Applying the primary duty test factors from 29 C.F.R. § 541.700(a), this Court has found that an employee's primary duty is that which is of "principal importance" to the employer, even if the employee spent more time on collateral tasks. *Powell v. Am. Red Cross*, 518 F. Supp. 2d 24, 43 (D.D.C. 2007) (citing *Rutlin v. Prime Succession, Inc.*, 220 F.3d 737, 742 (6th Cir. 2000); *Reich v. Wyoming*, 993 F.2d 739, 742 (10th Cir. 1993)). Indeed, in *Powell*, this Court granted a defendant-employer's motion for summary judgment, finding the plaintiff-employee to be exempt under the learned professional exemption when the employee's work included both exempt and non-exempt tasks because "exempt work was plaintiff's primary duty, even if it occupied less than fifty percent of her workday." *Id.*

In the present case, as set forth below, the record conclusively establishes that Plaintiff met all the requirements of the executive exemption during all relevant time periods. The only evidence that Plaintiff has is his own self-serving uncorroborated testimony. As such, he cannot prevail on his overtime claims as a matter of law. This Court should therefore grant summary judgment in favor of Defendants and dismiss Plaintiff's Complaint in its entirety.

      **1.**    **Plaintiff Met the Salary Requirements of 29 C.F.R. § 541.100(a)(1).**

In order to qualify as an exempt employee, the employee must be "compensated on a salary basis at a rate of not less than $455 per week." 29 C.F.R. § 541.100(a)(1). It is

undisputed that at all relevant times, Plaintiff was compensated on a salary basis at a rate of not less than $455 per week ($55,000 per year). *See* Statement of Undisputed Facts filed contemporaneously herewith ("SOF"), at ¶ 2. He received this salary regardless of the number of hours he worked per week. *Id.* His salary was significantly greater than the compensation he received when he was a Line Cook ($14 per hour). *See* SOF ¶ 1. Unlike when Plaintiff was a Line Cook, he was not required to clock in and out each day or otherwise record his hours. *See* SOF ¶ 1.

### 2. Plaintiff's Primary Duty Was Management of the Kitchen — A Recognized Department of ARG — and Plaintiff Customarily and Regularly Directed the Work of Two or More Employees.

Other than Plaintiff's self-serving denial of his management duties, the credible evidence in this case is that Plaintiff indeed was responsible for the overall kitchen operations and the supervision of the kitchen staff.[2] At the time Plaintiff was promoted to Sous Chef, he had over 19 years of experience in the culinary industry, and thus, was well qualified for the Sous Chef position. SOF ¶ 6. Under Plaintiff were all of the kitchen staff, including Line Cooks and Dishwashers. SOF ¶ 5. As explained succinctly in ARG's (Verified) Interrogatory Answers:

> [Plaintiff] was compensated on a salary basis at a weekly rate of $1,057.69 ($55,000 annually). His primary duty was to manage the restaurant's kitchen operations and staff, in connection with which he customarily and regularly directed the work of several other employees. Plaintiff possessed the independent authority to hire and fire other employees and, in addition, his suggestions and recommendations as to the hiring, firing, advancement, promotion and other status changes of Company employees were given great weight.

---

[2] For approximately the first month of Plaintiff's employment as Sous Chef, there was one other Sous Chef, Luis Benitez, employed at the restaurant. Thereafter, Plaintiff was the only Sous Chef employed by ARG. SOF ¶ 3. While Plaintiff and Mr. Benitez were employed as Sous Chefs at the same time, one was responsible for the day shift and one was responsible for the night shift. *Id.* During Plaintiff's tenure as Sous Chef, there was no Head Chef at the restaurant. SOF ¶ 4. Although Ms. Rivas' title was Executive Chef, her primary residence is in Florida and she was only present at the restaurant 2-5 days per month. *Id.* She did not oversee kitchen operations. *Id.*

> In addition to overseeing and managing kitchen operations, Plaintiff was charged with establishing work schedules for himself and all kitchen staff; assessing the kitchen staff's performance and providing input regarding employee raises, promotions, write-ups, and the like; managing inventory and ensuring the restaurant was appropriately stocked at all times; enforcing health/sanitation regulations as well as safety standards; participating in the preparation and design of all food menus; producing plates of the highest quality (both in terms of taste and design) and overseeing others doing the same; ensuring that kitchen staff operated in a timely and efficient manner while simultaneously meeting ARG's quality standards; assuming the role of Executive Chef, as necessary, in planning and directing food preparation; and taking control of and resolving problems involving kitchen staff and/or food preparation.

*See* Ex. B, Answer to Interrog. No. 2, at pp. 3-5.

Ms. Rivas also testified at length about Plaintiff's managerial job duties. *See also* Ex. F, Rivas Depo., Vol. II, 385:17-21 ("As a sous chef, he was in charge of running the day-to-day operations of the kitchen . . . inventory, ordering, creating dishes, hiring, training the staff…); *id.* at 387:16-21 (" . . . making sure that the kitchen was clean, that we were in compliance with the health department . . . supervising the guys to make sure that, you know, they came to work on time, . . . managing the kitchen"); *id.* at 372:6-7 ("He didn't have someone supervising him, he was a supervisor"); *id.* at 371:20-21 ("He didn't have a boss directly, he was the sous chef. So he was running the kitchen . . . ."); *id.* at 374:3-6 ("Making sure that the guys are sending the plates on time, that the plates are clean, that steaks – you know, checking the temperature, just orchestrating the kitchen as an entity . . . ."); *id.* at 397:11-13 (Plaintiff did inventory for the restaurant on a daily basis); *id.* at 375:8-16 (Plaintiff placed orders with vendors and did the schedule for kitchen staff )[3]; *id.* at 376:1-3 (Plaintiff did not need anyone's approval to prepare and issue the schedule).

---

[3] This portion of the transcript mistakenly references Plaintiff's counsel as the speaker, but it was clearly Ms. Rivas' testimony.

Similarly, Marlon Alfaro, the General Manager of the restaurant until his departure in January 2016, testifies as follows:

> Beginning in September 2015 when Plaintiff Anastacio Rodriguez ("Mr. Rodriguez") was promoted to the position of Sous Chef, his most important and primary duty was to manage the restaurant's kitchen operations and staff, including the daily supervision of approximately 8-10 kitchen employees per day (4-5 kitchen employees per shift). During meal rushes, Mr. Rodriguez would stand at the front of the kitchen giving instructions to the kitchen staff, as well as rotate among their stations to oversee their work.
>
> Mr. Rodriguez also established the work schedules for the kitchen staff. I did not approve the work schedules, nor did Mr. Bowen. Mr. Rodriguez had complete discretion in this regard.
>
> As Sous Chef, Mr. Rodriguez was responsible for enforcement of health/sanitation regulations as well as safety standards. Mr. Rodriguez typically worked 5-6 days per week. He worked no more than 60 hours per week, but more specifically, he worked approximately 48-56 hours per week. The restaurant served lunch and dinner on weekdays (Monday through Friday) and dinner on weekend nights (Saturday and Sunday). There was a lot of downtime between lunch and dinner shifts on weekdays.
>
> As Sous Chef, Mr. Rodriguez also assisted with the preparation/creation of food menus, and the inventory/ordering of ingredients and supplies. He had the responsibility to ensure that the plates coming from the kitchen were of the highest quality (both in terms of taste and design).

*See* Ex. G, Alfaro Decl. at ¶¶ 2, 5, 6 and 7 (internal paragraph numbers omitted).

Although Plaintiff also did food preparation and cooking as a Sous Chef, the *most important* aspect of his job was clearly the management of the kitchen and the kitchen staff. In this regard, Ms. Rivas testified at her deposition as follows:

> Q: . . . Can you speak about how important the various roles were, on a day-to-day basis, while he was working as a sous chef?
>
> A: He had to manage – his role was to manage and run the kitchen, to do schedules, to place orders, to create recipes, to make the soup-of-the-day to, you know, to do desserts, the daily specials, you know, to hire – and I think we still have current employees that he hired. I believe some of the dishwashers, so he would interview people and talk to them, and he was managing the kitchen.

*See* Ex. F, Rivas Depo., Vol. II, 323:1-13.  Likewise, Mr. Alfaro testifies:

> Beginning in September 2015 when Plaintiff Anastacio Rodriguez ("Mr. Rodriguez") was promoted to the position of Sous Chef, his *most important and primary duty* was to manage the restaurant's kitchen operations and staff, including the daily supervision of approximately 8-10 kitchen employees per day (4-5 kitchen employees per shift). During meal rushes, Mr. Rodriguez would stand at the front of the kitchen giving instructions to the kitchen staff, as well as rotate among their stations to oversee their work…Of course, Mr. Rodriguez, as Sous Chef, also participated in food preparation and cooking.  However, the more important aspect of his job was to oversee the kitchen operations and kitchen staff.

*See* Ex. G, Alfaro Decl. at ¶¶ 1, 7 (emphasis added).

### 3. Plaintiff Had the Authority to Hire or Fire Other Employees, or His Suggestions and Recommendations as to the Hiring, Firing, Advancement, or Any Other Change of Status of Other Employees Was Given Particular Weight.

According to both Ms. Rivas and Mr. Alfaro, Plaintiff had both the authority to hire and fire other employees and his suggestions and recommendations as to hiring and firing or other changes of status were given significant weight.  Mr. Alfaro testifies to the following:

> In connection with [Plaintiff's] supervision of the kitchen staff, he had the authority to hire and fire kitchen employees and his suggestions and recommendations as to hiring and firing of kitchen employees were given great weight.  Although I assisted with having new hires fill out hiring paperwork and getting them set up in the payroll system, Mr. Rodriguez was the one who interviewed new hires and would let me know if they were "good to go," meaning they should be hired by ARG in his opinion.  I recall at least 3 kitchen employees interviewed by Mr. Rodriguez and recommended by him for hire.  Although I technically had the authority to decide to not hire someone he recommended, I did not exercise that authority and instead relied upon his judgment regarding whether to hire them for employment.  Additionally, while pay rates are set generally by the restaurant based on a person's position, Mr. Rodriguez had the authority to recommend a higher wage if he believed an individual was worth it.  I recall him doing so on at least two occasions, and both times I agreed to pay his recommended rate.

*See* Ex. G, Alfaro Decl. at ¶ 3.  Mr. Alfaro further states:

> Although Mr. Rodriguez had the authority to fire a kitchen staff

> employee, there was no need to do so while he was Sous Chef. I recall kitchen employees not showing up to work – abandoning their jobs, which we treated as a voluntary resignation so there was no need to terminate them. Furthermore, although Mr. Rodriguez had the authority to formally discipline employees, I do not believe he had the need to do so. However, he certainly counseled kitchen employees regarding how to do their jobs better on a regular basis, providing guidance in the kitchen while observing their work. Mr. Rodriguez also trained new hires in the kitchen.

*Id.* at ¶ 4; *see also* Ex. A, Rivas Depo., Vol. I, 161:10-18 (the Sous Chef had the authority to hire, and Plaintiff in fact did hire, kitchen staff).

Based upon the above, it is clear that Plaintiff was properly classified as exempt under the FLSA. Recently, a federal district court in New York granted a motion for summary judgment in favor of a restaurant employer, holding that a plaintiff head sous chef was exempt under the executive exemption. *See Tamayo v. DHR Rest. Co.*, 14 Civ. 9633-GBD, 2017 U.S. Dist. LEXIS 18102, at *30-35 (S.D.N.Y. Feb. 3, 2017). In *Tamayo*, the court found that the executive exemption applied where the record supported the conclusion that the plaintiff chef's managerial duties were important to the running of the defendant's restaurant. *See id*. Specifically, the court found that "[a]lthough some testimony establishe[d] that other employees performed some of [the plaintiff's] managerial duties," the record was "clear that [the plaintiff's] management duties were very important to [the restaurant]." *Id.* at *32. Further, the court found that the plaintiff "managed ingredient inventory and quality (including reviewing, scheduling, over[seeing] the preparation of those ingredients prior to the kitchen opening for the day; and serving as quality control for the restaurant's cooking)," and "recommended candidates to [the executive chef] for various kitchen vacancies based on [plaintiff's] own interviews with those candidates, and some of those candidates started work without ever meeting [the executive chef]." *Id.* at *31. In addition, the record established that the only employee above the plaintiff chef was the executive chef. *See id*. Based on such factors, the court found that management was the plaintiff's

"primary duty." *Id*. at *34. In contrast, the co-plaintiff, also a head chef, was not found to be exempt on summary judgment mainly because there remained a genuine issue of material fact as to whether his primary duties were managerial in nature since he only supervised other employees in the executive chef's absence and, overall, was more closely supervised by the executive chef than his exempt co-plaintiff. *See id.* at *23-30.

In the event Plaintiff points to the hourly wages of ARG's non-exempt kitchen staff as evidence of his alleged misclassification, his reliance on this data is misplaced. While it is true that "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee" is relevant in determining whether an employee's "primary duty" is the performance of exempt work, it is only one factor in an analysis that "must be based on all the facts in a particular case, with *the major emphasis on the character of the employee's job* as a whole." 29 C.F.R. § 541.700(a) (emphasis added). In fact, the weight of other employees' wages is minimized in the regulations, which contemplates (by way of example) that assistant retail managers "generally" will not meet the primary duty requirement "if [they] are closely supervised *and* earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement." 29 C.F.R. § 541.700(c) (emphasis added). Here, not only was Plaintiff's salary as a Sous Chef significantly greater than his hourly wage as a Line Cook, the character of his work in the former was deeply rooted in the management of the kitchen and supervision of kitchen staff. Accordingly, the Court should find that Plaintiff's "primary duty" was the performance of exempt work.

### C. PLAINTIFF'S ASSERTION THAT DEFENDANTS' CONDUCT WAS WILLFUL FAILS AS A MATTER OF LAW.

As set forth above, Plaintiff was properly classified as an exempt employee. Notwithstanding, there is no factual support for Plaintiff's conclusory assertion that Defendants

willfully violated the FLSA. The "facts" upon which Plaintiff bases his assertion that Defendants' alleged failure to pay him overtime was "willful and intentional," "not in good faith," and/or "not the result of any bona fide dispute" (as alleged in ¶¶ 18, 25, 31, and 39 of the Complaint) are limited to the following:

> . . . [T]he composition of Defendants' staff – both quantitatively and qualitatively – was such that Defendants either knew of the existence of the minimum wage laws that are at issue in this case, or was such that Defendants acted with reckless disregard for the existence of such laws. Plaintiff further states that Defendants, in a deliberate attempt to avoid paying Plaintiff overtime wages, placed Plaintiff on salary at or around the time they increased his hours to approximately 70 per week.

*See* **Exhibit H**, Pl.'s Answers to ARG's First Set of Interrogs., Answer to Interrog. No. 15, at p. 8. However, the only supportable evidence in the case is that ARG acted in good faith in classifying Plaintiff as exempt:

> In classifying Plaintiff as an exempt employee during his time as Sous Chef, Defendants ARG and Rivas carefully evaluated the work he performed including, among other things, the employees he supervised and the extent to which he exercised discretion and independent judgment. Based on their reasonable understanding of the FLSA overtime rules, they concluded, in good faith, that Plaintiff was properly exempt from overtime requirements.

*See* Ex. B, Answer to Interrog. No. 13, at p. 12; *see also* Ex. F, Rivas Depo., Vol. II, 339:11-20 (stating that Sous Chefs were classified as exempt because it is industry standard and "[t]hey are managers, they are supervisors, they are in charge of operating the kitchen").

Under the FLSA, an action to collect unpaid overtime is "forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." *Figueroa v. D.C. Metro. Police Dep't*, 633 F.3d 1129, 394 U.S. App. D.C. 232 (D.C. Cir. 2011) (quoting 29 U.S.C. § 255(a) (2009)). A violation is willful only when "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by

15

the statute." *Gonda v. Donahoe*, 79 F. Supp. 3d 284, 306-307 (D.D.C. 2015) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988)). "Mere negligence on behalf of an employer is insufficient to trigger the three-year limitations period under the FLSA." *Deloatch v. Harris Teeter, Inc.*, 797 F. Supp. 2d 48, 55 (D.D.C. 2011) (citing *McLaughlin*, 486 U.S. at 133).

This Court recently found on summary judgment that an employer's alleged violation of the FLSA was not willful when the employer had "standard practices" for determining FLSA exemptions and plaintiff's anticipated job duties. *Gonda*, 79 F. Supp. 3d at 307. In ruling in favor of the defendant-employer, the Court found that to the extent the alleged violations occurred, they were not willful, despite the plaintiff's argument that her job duties differed from, and were "more mundane" than, the employer's formal job description. *Id.*

In another case, this Court also held on summary judgment that an employer's alleged violations of the FLSA were not willful. *Deloatch*, 797 F. Supp. 2d at 55. In *Deloatch*, the Court found that the defendant employer's handbook had explicit time and attendance policies to ensure FLSA compliance, and the employer conducted routine audits of time records to ensure compliance. *See id.* Based on these findings, the Court granted summary judgment for the employer on the willfulness/statute of limitations issue and noted that summary judgment was appropriate when "the employee's conclusory and unsupported allegations were insufficient to show that the defendant had willfully violated the FLSA." *Id.* (citing *Phuong v. Nat'l Acad. Of Scis.*, 901 F. Supp. 12, 15 (D.D.C. 1995)). In the present case, there is simply no evidence that Defendants acted willfully in classifying Plaintiff as exempt.

## IV. CONCLUSION.

As set forth above, Plaintiff has not made the requisite showings to justify a trial on the merits of his claims. Defendants should not be required to undergo the costs and expenses

associated with trial where Plaintiff's claims are unsupported by any evidence and are based merely on Plaintiff's self-serving assertions of wrongdoing. Therefore, Defendants respectfully request that summary judgment be entered in their favor, and ask for such other and further relief as this Court deems proper.

Respectfully submitted,

ADAMS RESTAURANT GROUP, INC. AND CLAUDIA RIVAS

By Counsel

/s/ Karen A. Doner
Karen A. Doner (Bar No. 458626)
Natalie A. Rainforth (Bar No. 999159)
Doner Law, PLC
1750 Tysons Boulevard, Suite 1500
Tysons Corner, Virginia 22102
Tel: (703) 462-5471
Fax: (703) 462-5437
kdoner@donerlawplc.com
npoteet@donerlawplc.com

*Counsel for Defendants*