# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ANASTACIO SALVADOR RODRIGUEZ

   Plaintiff

v.                                    CASE NO.:

ADAMS RESTAURANT GROUP, INC.,         1:16-CV-00977-EGS

D/B/A CLAUDIA'S STEAKHOUSE,

et al.

   Defendants                         VOLUME I

_____x

       Tuesday, January 31, 2017

       Silver Spring, Maryland

Deposition of CLAUDIA SUSANA RIVAS, the witness, called for examination by counsel for the plaintiff, pursuant to notice, held at the law offices of Zipin, Amster & Greenberg, LLC, 8757 Georgia Avenue, Suite 400, Silver Spring, Maryland 20910, beginning at 9:30 a.m., before E. Marsellas Coates, a Notary Public in and for the State of Maryland, when were present on behalf of the respective parties:

1    A.   Yes.

2    Q.   And you are the executive chef, correct?

3    A.   Yes.

4    Q.   And Mr. Adams is the CEO?

5    A.   Yes.

6    Q.   Does he have any other role, other than
7  the CEO?

8    A.   I guess president.

9    Q.   Okay.  CEO and president.  Okay.  Is
10 Sharon -- is it Pellecchia, is that how you say
11 it?

12   A.   Pellecchia.  I think they debate the how.

13   Q.   Okay.  Sharon Pellecchia, where does she
14 live?

15   A.   Maryland.  LaPlata, I think.

16   Q.   Okay.

17   A.   I don't think -- yeah, in LaPlata.

18   Q.   Is she an employee of Adams Restaurant
19 Group on a contractor?

20   A.   She is support to Adams Restaurant Group,
21 but she does -- her employer is Mr. Adams' comp --

1  she was HI (sic), you know. I just know that
2  that's what she did.
3       Q.  What's her name?
4       A.  Lisa.
5       Q.  What's her last name?
6       A.  I don't know.
7       Q.  Okay. Are you still in contact with her?
8       A.  No.
9       Q.  Okay. If you could turn to page ARG 71.
10      A.  Okay. (Witness complying.)
11      Q.  You see that, it says the Hours of
12  Operation?
13      A.  Yes.
14      Q.  Are those the current hours of operation
15  of ARG?
16      A.  I will take a minute to --
17      Q.  Sure. Take your time.
18      A.  (Witness reviewing document.) That looks
19  about right.
20      Q.  Have those been the hours of operation
21  for ARG since its inception?

1 On -- if you look at the bottom, where it says

2 Time and Attendance Policies.

3      A.   Yes.

4      Q.   And it says Employment Categories, do you

5 see that?

6      A.   (Witness reviewing document.)  Yes.

7      Q.   And it's got three different categories,

8 it's got exempt -- I'm sorry, it's got four

9 categories, it's got exempt, nonexempt, full-time,

10 and part-time, do you see that?

11     A.   Yes.

12     Q.   When Mr. -- when the Plaintiff was

13 working for you on an hourly basis, was he ever --

14 was he considered part-time or full-time?

15     A.   I think he was part-time.

16     Q.   Was he ever considered full-time?

17     A.   I don't think so.

18          MS. DONER:  Michael, whenever you get a

19 minute, at a good breaking point, can we take a

20 five-minute break?

21          MR. AMSTER:  Sure.  We can take it right

1       Q.   Mr. Rodriguez never received Paid Time

2  Off, correct?

3       A.   When he was salaried?

4       Q.   Right.

5       A.   He did.

6       Q.   How much Paid Time Off did he receive?

7       A.   He had eye surgery, and it had been four

8  days that he was out or five days, I'm not sure.

9       Q.   Is that it?

10      A.   That he took.  I think he took --

11      Q.   I guess -- I'm not asking about whether

12 or not --

13           MS. DONER:  Can she finish her answer.

14      Q.   I'm not asking about whether or not --

15 obviously he didn't work every single day, right?

16      A.   Right.

17      Q.   Okay.  He took days off, right?

18      A.   Yes.

19      Q.   And he was paid the same salary

20 regardless, right?

21      A.   Right.

1    Q.  Only the general manager?

2    A.  Was the one that hired.

3    Q.  Only the general manager?

4    A.  Yes.

5    Q.  And you, as the executive team?

6    A.  Yes.

7    Q.  Okay. So that is a responsibility that
8  the general manager had that the -- that the other
9  restaurant managers did not have?

10   A.  The Back of the House managers or sous
11 chefs or chef, had the authority to hire people
12 for the Back of the house.

13   Q.  Okay. Well, I'm not talking about the
14 Back of the House.

15   A.  The general manager did not get involved
16 with the Back of the House hiring. Maybe the
17 kitchen managers or sous chefs or chefs will run
18 the kitchen.

19   Q.  Okay. So other than general manager and
20 -- we'll just call this -- let's just say, from
21 now on, is it fair to say assistant managers,

1   Q.  So did Calvin Flores become the chef?
2   A.  He became the main person to run the
3   kitchen with another sous chef.
4   Q.  Okay.  So let's back up a little bit.  So
5   we've got the executive chef, we've got the sous
6   chefs; is there anyone -- what other titles are in
7   the Back of the House?  And, again, let's just
8   talk about the time from the inception of ARG
9   until the time that Mr. Rodriguez left.  I don't
10  really care about what happened after that.
11  A.  When Brad left, he had Calvin as a sous
12  chef.
13  Q.  Okay.
14  A.  And after the sous chef, I think we had
15  line cooks, fryers, salad, desserts --
16  Q.  Okay.
17  A.  -- and prep, and preparation.
18  Q.  Okay.  So you've got executive chef?
19  A.  Mm-hmm.
20  Q.  Sous chef?
21  A.  Mm-hmm.

1  correct?
2      A.  I don't think his position changed.  He
3  was a sous chef.
4      Q.  You said you put him in charge of the
5  kitchen?
6          MS. DONER:  Objection to form.  That's
7  not her testimony.
8      A.  He was the second person in charge of the
9  kitchen after Brad left.
10     Q.  After you?
11     A.  I didn't run the kitchen.
12     Q.  You said he was the second person in
13 charge?
14     A.  Calvin was.
15     Q.  Second after you?
16     A.  How could he be after me?
17     Q.  Who was he second after?
18     A.  After Brad.
19     Q.  Okay.  After Brad left, Calvin Flores was
20 in charge?
21     A.  Yes.

1  hung at the restaurant, at the office.
2      Q.  Okay.  When was that video camera set up?
3      A.  When we first opened, prior to opening.
4      Q.  Okay.  So you made the discussion to put
5  those cameras up there?
6      A.  Of course, security.
7      Q.  And why did you put the cameras up there?
8      A.  Theft.
9      Q.  From employees?
10     A.  Safety of the employees, theft.  For
11 security reasons.
12     Q.  Okay.  You were concerned about the
13 employees stealing?
14     A.  Yes.
15     Q.  Okay.  So when did your app stop working
16 on your phone, do you remember?
17     A.  No idea.
18     Q.  Was that before or after Plaintiff left?
19     A.  Probably before.  I don't know.
20     Q.  Okay.  Who is Mercedes Villalta?
21     A.  My daughter.

1      A.   Yes.

2      Q.   And what did -- what were the
3  conversations?

4      A.   When -- I think when Calvin left, you
5  know, Anastacio has over 19 years of experience in
6  cooking, and -- and he's a hard worker.  He
7  created good dishes, and when Marlon called, he
8  said, you know, I think that he would be a great
9  fit for the sous chef position.  And he said I
10 think he -- we could, you know, pay him a salary.
11 The -- I think it was $55,000.  And I said okay,
12 if that's what we need to do to maintain the
13 consistency in the kitchen, I -- that's okay.

14     Q.   Okay.  So those are the type of things
15 that you discussed with Mr. Alfaro?

16     A.   Yes.

17     Q.   Who determined that he should be paid
18 $55,000?

19     A.   Marlon suggested that, and we approved
20 it.

21     Q.   Okay.

1     A.  I don't know.

2     Q.  Did Mr. Rodriguez have a Bachelor's
3  degree?

4     A.  I don't know.

5     Q.  Did Mr. Rodriguez have a high school
6  degree?

7     A.  I don't know.

8     Q.  Did Mr. Rodriguez ever hold the position
9  as a chef prior to working for ARG?

10    A.  I don't know.

11    Q.  Are you familiar with any of the
12 positions that Mr. Rodriguez held prior to working
13 for ARG?

14    A.  No.

15    Q.  Okay.  You said that you are aware of
16 some of the experience that he had?

17    A.  Yes.

18    Q.  What experience, as far as you know, did
19 Mr. Rodriguez have prior to working for ARG?

20    A.  He has worked with the chef who owns
21 Estadio, a local -- a local renowned chef, for

1  seven -- I think, maybe, I don't know.  I just

2  don't -- conversations -- I know that he -- he

3  told me, you know, one time when I was at the

4  restaurant that he's been in the industry for 19

5  years, over 19 years.

6      Q.  You said that you were aware that he had

7  worked for Estadio?

8      A.  Estadio, I think it was.  Don't -- I am

9  not sure, I think it was Estadio, because he --

10     Q.  Okay.  Let me ask you this, do you know

11 what position he held at Estadio?

12     A.  No.

13     Q.  Okay.  Who interviewed Mr. Rodriguez when

14 he first started working for ARG?

15     A.  Brad Race.

16     Q.  I'm sorry?

17     A.  Brad Race.

18     Q.  Okay.  Did you interview Mr. Rodriguez

19 before he became the sous chef?

20     A.  No.

21     Q.  Did you have any conversations with

```
 1        CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

 2              I, Dawn L. Halcisak, Court Reporter and Notary

 3        Public in and for the State of Maryland, the officer

 4        before whom the foregoing deposition was taken, do

 5        hereby certify that the foregoing transcript is a

 6        true and correct record of the testimony given; that

 7        said testimony was taken by me stenographically and

 8        thereafter reduced to typewriting under my direction

 9        and that I am neither counsel for, related to, nor

10        employed by any of the parties to this case and have

11        no interest, financial or otherwise, in its outcome.

12

13        My commission expires:

14        August 4, 2019

15

16

17        _____

18        NOTARY PUBLIC IN AND FOR THE

19        STATE OF MARYLAND

20

21
```