# EXHIBIT F

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---------------------------------x
ANASTACIO SALVADOR RODRIGUEZ,
     Plaintiff,       \*  Civil Action No.:

V.                               \*  1:16-CV-00977-EGS

ADAMS RESTAURANT GROUP, INC., \*

D/B/A CLAUDIA'S STEAKHOUSE,  \*

ET AL.                         \*

     Defendants.        \*
---------------------------------x

                       Tysons Corner, Virginia
                       Wednesday, February 1, 2017
Volume II, Continued Deposition of:

              CLAUDIA SUSANA RIVAS,

a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by DAWN L. HALCISAK, a Notary Public in and for the State of Virginia, taken at the Law Offices of Doner Law, PLC, 8200 Greensboro Drive, Suite 900, Tysons Corner, Virginia 22102, at 9:49 a.m., and the proceeding being taken down by Stenotype by DAWN L. HALCISAK, CLR, and transcribed under her direction.

1        Can you speak about how important the
2   various roles were, on a day-to-day basis, while he
3   was working as a sous chef?
4            MS. DONER: Objection to form.
5            THE WITNESS: He had to manage -- his role
6   was to manage and run the kitchen, to do schedules,
7   to place orders, to create recipes, to make the
8   soup-of-the-day to, you know, to do desserts, the
9   daily specials, you know, to hire -- and I think we
10  still have current employees that he hired.  I
11  believe some of the dishwashers, so he would
12  interview people and talk to them, and he was
13  managing the kitchen.
14  BY MR. AMSTER:
15      Q.   Okay.  During the time that Mr. Rodriguez
16  became salaried, how many cooks were working for
17  ARG?
18      A.   I don't know.
19      Q.   How many cooks would work on a typical
20  weekday?
21      A.   (No verbal response.)

1  you about when you made the decision.
2          Do you know when you made the decision?
3          THE WITNESS:  I feel --
4          MR. ADAMS:  (Inaudible) should have asked.
5          MR. AMSTER:  Can you please look at me,
6  I'm the one asking the questions here --
7          THE WITNESS:  Yes, I understand that.
8  BY MR. AMSTER:
9      Q.  My question is -- let me ask you a
10 different question.
11         When ARG hired its first sous chef, why
12 did you designate that sous chef as exempt?
13         MS. DONER:  Objection to form.
14         THE WITNESS:  It's an industry standard --
15 it's an industry standard.
16 BY MR. AMSTER:
17     Q.  Okay.  Is that the only reason?
18     A.  They are managers, they are supervisors,
19 they are in charge of operating the kitchen or the
20 front of the house.
21     Q.  Right.  Okay.  Well, we don't know

1  further.

2           MS. DONER:  That's my position, that

3  you're responsible for the interpreter's fees, to

4  the extent that you're -- you are elongating the

5  deposition beyond what's necessary.

6  BY MR. AMSTER:

7      Q.   Ms. Rivas, do you remember what my

8  previous question was?

9      A.   No.

10     Q.   I don't know either.

11          MR. AMSTER:  Can you read back my previous

12 question?

13              *    (Question read.)

14 BY MR. AMSTER:

15     Q.   So Mr. Alfaro was -- he left after --

16 before Mr. Rodriguez left, correct?

17     A.   Yes.

18     Q.   Okay.  So who was Mr. Alfaro Rodriguez's

19 boss after Alfaro left?

20     A.   He didn't have a boss directly, he was the

21 sous chef.  So he was running the kitchen as the

1  other, you know -- the guys at the front of the
2  house and the back of the house Anastacio, so --
3      Q.   Is your position that he didn't have a
4  boss?
5          MS. DONER:  Objection.
6          THE WITNESS:  He didn't have someone
7  supervising him, he was a supervisor.
8  BY MR. AMSTER:
9      Q.   Okay.  Mr. Rodriguez, as sous chef, he
10 cooked, correct?
11     A.   Yes.
12     Q.   He engaged in preparing things to cook, as
13 well, correct?
14         MS. DONER:  Objection; asked and answered.
15         THE WITNESS:  I'm assuming, as a sous
16 chef, that he will be not only cooking and
17 preparing but doing the necessary steps to run the
18 kitchen on a daily basis.
19 BY MR. AMSTER:
20     Q.   When you say you're assuming, is that
21 because you don't know whether or not he actually

1    A.   I mean, he could be running the line and
2  just running the expo on the other side.
3        Making sure that the guys are sending the
4  plates on time, that the plates are clean, that the
5  steaks -- you know, checking the temperature, just
6  orchestrating the kitchen as an entity.
7        So at the restaurant we have a line, and
8  so sometimes he will just run the expo.  So I don't
9  know -- I mean, I don't know, as a manager --
10   Q.   Did you observe Mr. Rodriguez working?
11   A.   When I would come to the restaurant,
12 absolutely.
13   Q.   So you're familiar with what he was doing
14 on -- while he was working?
15        MS. DONER:  Objection to form.
16 BY MR. AMSTER:
17   Q.   Are you familiar with what he was doing
18 while he was working?
19        MS. DONER:  Same objection.
20        THE WITNESS:  I have a general idea of
21 what it takes to run the kitchen, as a chef --

BY MR. AMSTER:

    Q.   All right. I understand that, but that's not my question.

    My question is: Are you familiar with what Mr. Rodriguez specifically was doing while he was working as a sous chef?

    MS. DONER: Same objection.

    MR. AMSTER: Ask me a specific question, because that question is so open, for me to tell you, you know, like I know that he places orders from the vendors, I know that he did schedules. I know that he --

BY MR. AMSTER:

    Q.   When you say that he did schedules, what do you mean by that?

    A.   He did the kitchen schedule for the staff.

    Q.   What was what the purposes in doing the kitchen schedule?

    A.   I have no idea. They do that --

    Q.   You're not familiar with that process?

    A.   No.

1    Q.   Okay.  Did Mr. Rodriguez have those
2 schedules approved by the managers?
3    A.   He didn't need to have them approved --
4    Q.   That's not my question.
5    A.   I don't know.
6    Q.   You don't know, okay.
7         And when I say "managers," I mean managers
8 as -- restaurant managers?
9    A.   Okay.
10   Q.   The answer is you don't know?
11   A.   I don't know.
12   Q.   Did he have to have them approved by the
13 general manager?
14   A.   If we had -- or when we had the general
15 manager, I'm sure he would look at it and just --
16 like "Okay."  But he was in charge of the doing
17 schedules.
18   Q.   Okay.  So the general manager would review
19 the schedule before they were finalized; is that
20 correct?
21        MS. DONER:  Objection to from.

1    Q.    Okay.  What else did Mr. Rodriguez do in

2  his -- well, what was his responsibilities as a

3  sous chef?

4    A.    To --

5         MS. DONER:  Objection; it's been asked and

6  answered.

7         MR. AMSTER:  It really hasn't.

8         MS. DONER:  If it hasn't been asked after

9  this many hours of a deposition, which is the key

10 issue in the case, I would be shocked.  But I

11 believe you have asked and she's answered it, and

12 she testified already, in depth, as to what his

13 responsibilities were.

14        But you can answer it.

15 BY MR. AMSTER:

16   Q.    Ms. Rivas?

17   A.    As a sous chef, he was in charge of

18 running the day-to-day operations of the kitchen --

19   Q.    Okay.

20   A.    -- inventory, ordering, creating dishes,

21 hiring, training the staff.

1  BY MR. AMSTER:

2      Q.   Ms. Rivas, let me --

3           MS. DONER:  No, you don't like --

4           MR. AMSTER:  -- you don't like me

5  complaining about this taking too long, I'm trying

6  to speed it along.

7           MS. DONER:  Her answer is completely

8  responsive.  You don't like the answer and that's

9  why you're cutting her off.

10          MR. AMSTER:  All right, keep going.

11 That's fine.

12          MS. DONER:  Allow her to finish her

13 answer.

14          THE WITNESS:  So inventory, placing the

15 orders, like I said, creating dishes, doing

16 schedules, making sure that the kitchen was clean,

17 that we were in compliance with the health

18 department.  You know, he -- the certification and

19 supervising the guys to make sure that, you know,

20 they came to work on time, that time schedule's --

21 managing the kitchen --

1  inception of the restaurant. But then he became a
2  restaurant manager.
3      Q.   Okay. Did the bar -- when he was a bar
4  manager, did he place orders, as well?
5           THE WITNESS: I think so --
6           MS. DONER: Objection to form.
7           THE WITNESS:   -- I think so.
8  BY MR. AMSTER:
9      Q.   Okay. What was the process in which the
10 Plaintiff placed an order?
11     A.   He will do inventory, every day. He had a
12 list, a checklist, that he will do on that daily
13 and weekly basis.
14     Q.   What does that checklist look like?
15     A.   We can send those forms, we have them at
16 the restaurant.
17     Q.   Who made that checklist?
18     A.   Corporate probably or Chef maybe. It
19 might have been Brad. So we can provide you with
20 those documents.
21          MR. AMSTER: Can we do that, counsel?

1   MS. DONER: Okay.

2   MR. AMSTER: It shouldn't take more than
3   two minutes.

4   (Recessed at 11:54 a.m.)

5   (Reconvened at 12:06 p.m.)

6   MS. DONER: All right. Are we ready to go
7   back on the record?

8   EXAMINATION BY COUNSEL FOR DEFENDANTS
9   BY MS. DONER:

10  Q. Ms. Rivas, I'm just going to ask you a
11  couple of questions about your testimony yesterday
12  and today.

13  Yesterday Mr. Amster asked you a question
14  about the different uniforms that the sous chef
15  wears.

16  Can you tell us about the difference
17  between what a sous chef wears, versus a line cook?

18  A. They have their title and their name
19  embroidery -- embroidery on the chef jacket.

20  Q. Okay.

21  A. Also sometimes, we have had a red jacket

1        Do you recall that?

2    A.  Yes.

3    Q.  Okay.  How many days per month,

4 approximately, are you at the restaurant in DC?

5 And I'm referring to the period of time when

6 Mr. Rodriguez was employed.

7    A.  Two to five maybe.

8    Q.  Two to five days, per month?

9    A.  Yes, per month.

10   Q.  And yesterday, Mr. Amster asked you about

11 the purpose of a video monitor --

12   A.  Yes.

13   Q.  -- or security video?

14   A.  Yes.

15   Q.  And you testified that it was used for

16 both security and also to prevent theft; is that

17 right?

18   A.  Yes.

19   Q.  Okay.  Did you ever view the video from

20 Florida, or anywhere else, to see what was going on

21 in the kitchen as a means to supervise what was

1  going on in the kitchen?

2     A.   No.

3     Q.   And so any assertion by Mr. Rodriguez that

4  you did do that is untrue; is that correct?

5     A.   Correct.

6     Q.   Yesterday you testified about something

7  that you had wanted to correct this morning.

8  Mr. Amster had asked you who does the accounting

9  for the restaurant?

10    A.   Yes.

11    Q.   Okay. And I believe you said it was the

12 company Aronson?

13    A.   Yes.

14    Q.   Okay. What would you like to change about

15 your testimony?

16    A.   They are the company that filed the taxes

17 for us so that we know, you know, like did we lose,

18 whatever, whatever. But the CFO of Mr. Adams'

19 company is the person -- his name is Reli, R-E-L-I,

20 he's --

21         MR. AMSTER: What's his last name?

```
 1    CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
 2            I, Dawn L. Halcisak, Court Reporter and Notary
 3    Public in and for the State of Maryland, the officer
 4    before whom the foregoing deposition was taken, do
 5    hereby certify that the foregoing transcript is a
 6    true and correct record of the testimony given; that
 7    said testimony was taken by me stenographically and
 8    thereafter reduced to typewriting under my direction
 9    and that I am neither counsel for, related to, nor
10    employed by any of the parties to this case and have
11    no interest, financial or otherwise, in its outcome.
12
13    My commission expires:
14    August 4, 2019
15
16
17    _____
18    NOTARY PUBLIC IN AND FOR THE
19    STATE OF MARYLAND
20
21
```